# AFFIDAVIT OF ATF SPECIAL AGENT MATTHEW SHIBLEY

I, Special Agent Matthew Shibley, being sworn, state as follows:

## INTRODUCTION

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), where I have been employed for approximately ten years. I am currently assigned to the Boston Group II Field Office and my duties include, among other things, the investigation of violations of laws related to firearms trafficking, firearm possession by prohibited persons, the use of firearms in drug trafficking crimes, and the investigation of violations of laws related to explosives violations and incendiary (arson) fires. I am a graduate of the ATF National Academy and of the Federal Law Enforcement Training Center.

2. During the course of my law enforcement career, I have participated in all aspects of drug investigations, including physical surveillance, surveillance of controlled purchase transactions, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and the methods of payment for such drugs.

3. Based on my training and experience, I know that it is a violation of Title 21, United States Code, Section 841(a)(1) for any person to knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. I am also aware that heroin is listed as a Schedule I controlled

substance and fentanyl is listed as a Schedule II controlled substance, under the drug scheduling guidelines.

4. I make this affidavit in support of a criminal complaint charging JOMAR VENTURA (DOB xx-xx-1994) with illegally possessing and distributing Schedule I and Schedule II controlled substances in violation of 21 U.S.C. §841(a)(1).

5. The statements contained in this affidavit are based on my own work in this investigation, my training and experience, and information provided by other agents, police officers, and witnesses. This affidavit is submitted for the limited purpose of establishing probable cause to believe that VENTURA violated 21 U.S.C. § 841(a)(1). It therefore does not set forth all of the information that I and other law enforcement personnel have obtained during the course of the investigation.

## USE AND RELIABILITY OF A COOPERATING WITNESS; IDENTIFICATION OF JOMAR VENTURA AS DRUG DEALER "OSCAR"

6. Since approximately August of 2017, the ATF has been engaged in investigations focusing on narcotics distribution and illegal firearm possessions occurring in and around the Mary Ellen McCormick, Old Colony Avenue, and D Street housing developments in South Boston, MA ("the Developments"). The instant investigation is one of these investigations.

7. A cooperating witness ("CW") was enlisted to assist in the instant investigation. At the outset of the investigation, the CW was provided with an apartment located at 1 Gavin Way, Apartment #557, South Boston, MA, in the Mary Ellen McCormick Development. After moving into this apartment, the CW was instructed to identify and become acquainted with individuals in the development and to gather evidence relative to their drug distribution, illegal firearm possession, and/or acts of violence. To date, under ATF's direction, the CW has made multiple controlled purchases of firearms and narcotics.

2

8.      Over the next few months, the CW was able to develop relationships with numerous individuals who he/she had observed distributing narcotics within the Developments. Based upon the CW's information, ATF Agents were able to identify individuals such as VENTURA, who were involved with the distribution of heroin and fentanyl and the unlawful dealing in firearms.

9.      Specifically, in March 2018, the CW received information regarding a heroin dealer from South Boston named "OSCAR" (later determined to be Jomar VENTURA). The CW obtained a cellular phone number (617-840-9167) for "OSCAR," and was told that he/she could call, introduce himself/herself, and arrange a heroin purchase.

10.     A query of cellular phone number (617-840-9167) was conducted in the Accurint LexisNexis public records search database, which showed the name JOMAR VENTURA, with a listed address of 1262 Columbia Road, Apt 776, South Boston, MA. Additionally, a query of cellular phone number (617-840-9167) was conducted in the Facebook social media website, which showed a Facebook page with the name "JOMAR VENTURA." A Massachusetts driver's license query for JOMAR VENTURA (DOB xx-xx-1994) was conducted, which showed an active driver's license for JOMAR VENTURA with an address of 1262 Columbia Road, Apt 776, South Boston, MA.

11.     At the direction of ATF, in March 2018, the CW began to make controlled purchases of narcotics from VENTURA. These controlled purchases were conducted using the following standard procedures. For each of these controlled purchases, fellow investigators and I met with the CW, searched his/her person and vehicle (if used) finding no contraband, equipped the CW with a transmitting device and one or more audio/video recording devices, and provided the CW with government funds for the purchase of evidence. We then followed the CW to a

specific target area to the extent practicable,[1] monitored conversations and transactions the CW had as they were transmitted over ATF radios, and then followed the CW back to a designated location for evidence transfer, contraband check, and debriefing. We then preserved all evidence as well as all electronic surveillance evidence on compact discs containing the audio/video recordings of the undercover transactions.

12. Additionally, ATF Agents were able to secrete a covert audio/video recording device inside the CW's apartment. This recording equipment allowed for "real time" monitoring as video was streamed to a specific website from which investigators are able to record. Three controlled purchases were recorded inside the CW's apartment using this equipment, and VENTURA's offer to sell the CW firearms was recorded using this equipment as well.

13. In total, between March 2018 and May 2018, the CW made four controlled purchases of narcotics from VENTURA. I have received certificates of drug analysis for the substances purchased by the CW in all of these controlled purchases. The substances tested positive for heroin and fentanyl.

14. Since the start of my dealings with the CW, I have found the CW to be truthful and reliable, and I have found his/her information to be accurate and often independently corroborated by other evidence. The CW has multiple arrests and criminal convictions for forgery, uttering counterfeit notes, motor vehicle violations, disorderly conduct, impersonation, and telecommunications fraud. ATF pays the CW for his/her services, and Homeland Security Investigations ("HSI") provides a Deferred Action on his/her immigration status.

---

[1] The area within which the CW was operating was very difficult to surveil due to closeness of the community and the difficulty of establishing safe surveillance positions that would not be noticed by area dealers.

**PROBABLE CAUSE**

**March 19, 2018 Purchase of 5.06 Grams of Heroin and Fentanyl from Ventura;
Photo Identification of Ventura**

15. On March 18, 2018, Special Agent (SA) Keltar Mui and I instructed the CW to call VENTURA at cellular phone number 617-840-9167 to arrange a heroin purchase from him for the next day. VENTURA answered the phone, and agreed to meet the CW the next day at the CW's undercover apartment to make the sale.

16. On March 19, 2018, at approximately 2:00 pm, SA Mui and I equipped the CW with covert electronic recording equipment and provided the CW with $100 of pre-recorded ATF buy money, which was to be used to make the heroin purchase. The CW drove his/her vehicle to the undercover apartment. The CW contacted VENTURA and told him to come to 1 Gavin Way, apartment #557. VENTURA replied that he would be there in 10 to 15 minutes.

17. Around the designated time, from the apartment window, the CW viewed an individual whom he/she believed to be VENTURA exiting a black colored Honda Accord. Shortly thereafter, VENTURA entered the CW's apartment and sat down at the kitchen table. VENTURA then removed a tightly wrapped plastic baggie and placed it on the kitchen table. VENTURA said he wanted $1,150 for it and that there was fifteen grams in the plastic baggie. The CW explained that he/she was confused and that on the phone he/she thought he/she (the CW) was buying $50 dollars' worth (CW later explained that he/she thought VENTURA said "50" but he really said "15", meaning 15 grams). The CW asked VENTURA if he could give him/her (the CW) a few minutes to get more money. VENTURA replied yes and said that he lived around here. The CW then told VENTURA he/she would call him in 15 or 20 minutes. VENTURA exited the apartment.

18. SA Mui and I met up with the CW at an undisclosed location. After some negotiations between the CW and VENTURA via telephone, VENTURA agreed to sell the CW 5 grams of heroin for $400. The CW was provided with an additional $300 from Agent Cashier funds for him/her to use to make the purchase from VENTURA.

19. The CW returned to the undercover apartment, called VENTURA and said he/she wanted to make the purchase. VENTURA replied that he would be there in 10 to 15 minutes.

20. Video surveillance shows that VENTURA arrived inside the undercover apartment and sat down at the kitchen table. VENTURA removed a small plastic baggie and placed it on the table. VENTURA told the CW he paid $325 for it and he would sell it to him/her next time for $375. The CW counted the $400 aloud and placed it on the table. VENTURA took the buy money from the table while the CW explained that he/she wanted to make more purchases and that he/she (the CW) would call him (VENTURA) in a few days. VENTURA replied ok and exited. The CW left the plastic baggie of suspected heroin on the table.

21. SA Michael Romeo traveled to the undercover apartment and took the plastic baggie containing the suspected heroin from the table, searched the CW, and debriefed him/her. SA Romeo showed the CW the Massachusetts driver's license facial photograph, devoid of any identifiers, of VENTURA, and asked the CW if he/she recognized the individual. The CW replied that the person pictured was the person that had just sold him/her heroin.

22. I transported the baggie of suspected heroin and the electronic equipment to the ATF office. The baggie was placed on a digital scale that showed a weight of 5.45 grams. The baggie was logged in as ATF evidence and stored in the ATF Group II evidence vault. The baggie was sent to the Massachusetts state drug lab and tested positive for heroin and fentanyl;

the weight of the tested powder was 5.06 grams. SA Mui and I viewed the video recording and, comparing it to VENTURA's Massachusetts driver's license photo, also determined the seller and VENTURA were one and the same.

### March 28, 2018 Purchase of 9.1 Grams of Heroin/Fentanyl from Ventura

23. On March 26, 2018, at approximately 4:25 pm, the CW placed a monitored telephone call to VENTURA at phone number 617-840-9167, to arrange for the purchase of a "finger" or ten (10) grams of heroin from him. VENTURA stated his price for heroin was $75.00 per gram. VENTURA stated if the CW purchased forty (40) grams or more of heroin, he could give the CW a better price. The CW stated he/she only needed a "finger" of heroin, to which VENTURA responded with a price of $725.00. The CW arranged to meet VENTURA the following afternoon; however, on March 27, 2018, VENTURA told the CW he was unavailable.

24. On March 28, 2018, at approximately 11:00 am, the CW placed a telephone call to VENTURA at cellular phone number 617-840-9167. VENTURA stated to the CW that he was available to conduct the sale of heroin and agreed to meet around 3:00 pm that day.

25. On March 28, 2018, at approximately 2:40 pm, SA Mui met with the CW for the purpose of making a controlled purchase of heroin from VENTURA. The CW placed a monitored telephone call to VENTURA, in which VENTURA stated he would be at the CW's apartment in approximately twenty (20) minutes. SA Mui then equipped the CW with an audio/video recorder, a transmitter and pre-recorded ATF funds in the amount of $725.00.

26. At approximately 3:15 pm, the CW entered 1 Gavin Way and proceeded to his/her apartment. At approximately 3:24 pm, the CW placed a telephone call to VENTURA. During the conversation, VENTURA stated he would be at the CW's apartment in five (5) minutes.

27. At approximately 3:40 pm, agents saw VENTURA exit building 1262 Columbia Road and walk west on Columbia Road in the direction of Old Colony Ave. A few minutes later, VENTURA entered the CW's apartment, sat down at the kitchen table, and placed a bag of heroin on the table. VENTURA asked for a scale to weigh the narcotics and said he had to "eye" it when bagging it up. VENTURA stated the bag might be a little heavy. The CW then exchanged $725.00 in pre-recorded buy money for the narcotics. VENTURA stated the narcotics were stored in his house the previous day.

28. At approximately 3:50 pm, the CW ended the conversation with VENTURA. A short time later, agents observed VENTURA walking north on Old Colony Ave in the direction of Columbia Road, and then observed VENTURA return to 1262 Columbia Rd.

29. On the same day, at approximately 3:55 pm, SA Romeo traveled to the undercover apartment and recovered one (1) plastic bag containing a brown powdery substance. He also searched the CW, and debriefed him/her.

30. SA Mui and I transported the plastic bag containing the suspected heroin to the ATF Division Office and it weighed approximately 10.7 grams. The suspected heroin was then placed in the ATF evidence vault and then sent to the Massachusetts State drug laboratory, where it tested positive for heroin and fentanyl. The weight of the tested powder was 9.1 grams. The video recording reveals that the seller and VENTURA were one and the same.

**April 24, 2018 Purchase of 20.39 Grams of Heroin/Fentanyl from Ventura**

31. On April 23, 2018, the CW and VENTURA (617-840-9671) exchanged a series of text messages, where VENTURA agreed to sell the CW twenty (20) grams of heroin for $1400 the next day. On the morning of April 24, VENTURA told the CW via text message that he could make the sale around 2:00 pm and provided the CW the address of "1262 Columbia Road" as the meet location.

32.     On April 24, 2018, I met with the CW, equipped the CW with covert electronic recording equipment, and provided the CW with $1400 of pre-recorded ATF buy money to be used to make the heroin purchase.

33.     At approximately 2:30 pm, the CW parked his/her vehicle in front of building 1262 on Columbia Road.  The CW called VENTURA and told him he/she arrived.  VENTURA told the CW to come inside and go to the third floor.  The CW exited the vehicle and walked inside the building (#1262).  While in the stairwell traveling to the third floor, the CW was met by VENTURA.  VENTURA then led the CW up to the third floor.  The CW and VENTURA stood in the common hallway outside of apartment 776; VENTURA said "my mom's in the house" so they could do the deal "right here."

34.     VENTURA showed the CW a plastic baggie of what the CW believed to be heroin, which VENTURA was holding in his hand.  VENTURA told the CW it was "twenty" (referring to the weight of the baggie in grams) and then explained that the CW was getting it for a good price, "seventy a gram" ($70 a gram).  The CW counted out and handed $1400 to VENTURA.  VENTURA took the money and handed the CW the baggie of the suspected heroin.

35.     The CW and VENTURA discussed the possibility of VENTURA selling the CW a firearm.  The CW then exited down the stairwell with the baggie of heroin and returned to his/her vehicle.  The CW drove his/her vehicle to Gavin Way, parked, and entered his/her undercover apartment.  At approximately 2:49 pm, I entered the CW's undercover apartment and took from the CW one plastic baggie of suspected heroin, which was tied tightly in a knot.  I searched the CW and his/her vehicle for contraband and debriefed the CW.

36. I transported the baggie of suspected heroin and the electronic equipment to the ATF office. The baggie was placed on a digital scale that showed a weight of 21.14 grams. I placed the suspected heroin in the ATF evidence vault and then sent it to the Massachusetts State Drug Laboratory for testing, where it tested positive for heroin and fentanyl. The weight of the tested powder was 20.39 grams. I viewed the covert video recording and identified that the seller and VENTURA were one and the same.

### May 4, 2018 Purchase of 9.81 Grams of Heroin/Fentanyl from Ventura

37. On May 3, 2018, the CW arranged to purchase 10 grams of heroin/fentanyl from VENTURA the next day at noon. The CW asked VENTURA, "You coming over or you want me to come over?" VENTURA replied, "I would rather have you come over, but I won't be around until 1 o'clock." VENTURA also agreed to send the CW multiple photographs via text message of firearms that VENTURA's gun source had for sale. VENTURA told the CW to choose a gun from the photographs, and then "I'll buy it for you and you can come the next day or the day after." Later, still talking about the gun, VENTURA said, "You tell me which one you want and I'll grab it for you and I'll bring it or you'll come pick it up." However, ultimately, the CW and VENTURA agreed that VENTURA would come to the CW's apartment the next day for the drug deal.

38. On May 4, 2018, at approximately 12:00 pm, SA Mui and I met the CW to conduct the controlled heroin/fentanyl purchase from VENTURA. SA Mui and I provided the CW with $1000 of pre-recorded ATF buy money to make the heroin/fentanyl purchase and equipped the CW with covert electronic recording and monitoring equipment. The CW called VENTURA to confirm the purchase. VENTURA told the CW he would go to the undercover

apartment to make the sale and that he may be bringing someone with him. The CW replied ok and ended the call.

39. The CW drove in his/her vehicle to Gavin Way, parked, and entered the undercover apartment. At approximately 2:30 pm, VENTURA entered the UC apartment and removed a plastic baggie from inside his undershorts. While holding the plastic baggie, VENTURA sat down at the kitchen table. VENTURA placed the plastic baggie on the table and the CW asked, "How much is that?" VENTURA replied "six fifty" ($650).

40. VENTURA received a call on his cellular phone, and while VENTURA spoke with the caller in Spanish, the CW began to count aloud the buy money. VENTURA then counted the buy money that the CW had laid on the kitchen table and then picked the money up, stood up, and exited the apartment. The CW left the plastic baggie of suspected heroin/fentanyl on the table.

41. SA Romeo traveled to the undercover apartment and took the plastic baggie containing suspected heroin/fentanyl from the table, took the excess buy money, and searched and debriefed the CW.

42. I transported the baggie of suspected heroin/fentanyl and the electronic equipment to the ATF office. The baggie was placed on a digital scale that showed a weight of 10 grams. I placed the suspected heroin in the ATF evidence vault and then sent it to the Massachusetts State Drug Laboratory for testing, where it tested positive for heroin and fentanyl. The weight of the tested powder was 9.81 grams. I viewed the video recording and determined the seller and VENTURA were one and the same.

**CONCLUSION**

43. Based on the foregoing, I submit that there is probable cause to believe that, on March 19, 2018, March 28, 2018, April 24, 2018, and May 4, 2018, JOMAR VENTURA did distribute and possess with intent to distribute Schedule I & Schedule II controlled substances in violation of Title 21, United States Code, Section 841(a)(1).

I declare that the foregoing is true and correct to the best of my knowledge and belief.

_____
MATTHEW SHIBLEY
SPECIAL AGENT, ATF

Subscribed and sworn to before me this 19th day of September, 2018.

_____
HON. M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS